Good morning, Your Honor. Good morning, Counsel. Do you want to proceed? First of all, I'd like to reserve these 10 minutes for rebuttal, if I may. You should try to keep track of your own time. In this case, I'd also like to focus on the ERISA claim. We have two claims that are on and a enforcement of a collective bargaining agreement. The ERISA claim, I think, is the main claim, and it involves policy issues, specifically whether Congress meant to regulate this type of activity, and I think it's clear it has. ERISA is meant to regulate all aspects of employee benefit plans and to leave no holes. There are certain areas that they've ceded to the states, but it's been established that if there is a doubt, we are to err on the side of double regulation rather than leaving any holes. And leaving a hole in regulation is exactly what the appellees have argued and what the district court found. Now, our claim is that the South Bay trustees, the appellees, are fiduciaries over these funds. I think it's approximately $2.7 million that was turned over from my client's bakery driver's fund. I mean, it should be apparent just from the face of it that when you receive money from an employee benefit plan for the purpose of providing benefits, that that creates a fiduciary duty. If it's not apparent on the face of it, the statute makes that clear. A fiduciary is defined under ERISA, among other things, as exercising any control over assets. It doesn't have to be discretionary control, any control over assets. There's no doubt that the South Bay trustees exercise control over this money. That's conceded. So the question, the critical question here is whether those assets, those funds that were paid over from the security fund remained assets of the bakery driver's fund in the hands of the South Bay trustees. ERISA does not define assets by exception. And that exception is Section 401B2, the insurance exception. And the Supreme Court has already considered this exception. It's stated, as I just did, that assets are only defined by exception. Counsel, would you go back to the statutory definition of fiduciary? I understood you to say that fiduciary under ERISA was someone who exercises any control over assets. Which definition are you relying on? That's Section 321A of ERISA, 29 U.S.C. Section 1002, 21A. It defines a fiduciary as someone who exercises discretionary authority respecting management or exercises any authority or control respecting the management or disposition of its assets. Okay. Let's go to that term, respecting management or disposition of its assets. Can you tell me how, under what scenario the South Bay fund was exercising management, was managing or disposing of the fund's assets? Well, they concede they have. They took the funds, intermingled it with their own trust funds, and they had the authority to write Was that coming out of employee wages? Was that being a check cut by the Bakery Drivers Fund? Where was the money coming from? It originated from the employers who contributed to the Bakery Drivers Fund. Okay. And were they sending it to the Bakery Drivers Fund, or were they sending it directly over to the South Bay? They sent it first to the Bakery Drivers Fund. They sent the whole package of benefits, basically. This is only one part of it. Including $5.50 of the defined benefit, death benefit? Correct. And then, according to this death benefit agreement, that $5.50 was taken out of that and paid over to the South Bay Trust. So this money began with the employers who paid it to the Bakery Drivers Fund as part of the compensation for the employees. And there's conflicting decisions at what point it becomes assets there, but definitely once it's received by the Bakery Drivers Fund, that's an asset of the fund, which my clients, the Bakery Driver Trustees, have a fiduciary duty over. They then paid it over to the South Bay Trustees. So the question is, it's unquestionably an asset of the Bakery Drivers Fund in the hands of the South Bay Trustees. Should South Bay have anticipated that they were going to be governed by ERISA? Yes. Does the agreement provide anything to that effect? The agreement states that a plan of benefits is created, and plan of benefits is an ERISA term that creates these duties under ERISA. Nothing was said in the agreement, though, about what would happen to anything that wasn't paid out in death benefits. Well, the agreement was silent as to what would happen upon termination, but it does say that these funds are paid over to fund the payment of death benefits to security fund participants. Which page are you on? This is on the excerpts of record, tab 15, page 190. Paragraph C of the agreement? Correct. So by this agreement, the funds are being handed over to the South Bay Fund for this express purpose, the payment of death benefits to security fund participants. No other purpose is authorized anywhere except administration, which is authorized farther down in the agreement, but nothing else is authorized for the use of these funds. Is it your contention that if the South Bay had funded death benefits and at some point had said, we've paid out more than we took in, that the bakery drivers would have been paid? At that point, which never, ever occurred, so this is an entirely hypothetical question. At that point, they could say that we don't have to fund these out of the money that's meant for our participants, so they could, I believe, have come back and said, we need more money to fund this plan. And is there anything that they could have pointed to in any of the documents that would have justified that claim? It would not have been in the documents. Is there anything anyplace else that would have justified that claim, although it just sort of doesn't seem fair? Well, it's the same type of residuity that we're asserting here. We're saying they can't use our money, or the bakery drivers' money, to pay benefits for South Bay participants, and they could, on the same theory, say we don't have to use South Bay, money that's meant for South Bay participants, that we as, or they as South Bay trustees have a duty to keep just for those participants. They don't have to use that for bakery driver participants, and then ask at the appropriate time for whatever it takes to fully fund the benefits. Again, this is purely hypothetical, so we're all sort of spinning in the air about this. This never came up, ever. Even in the very beginning, the claims didn't start coming in until the benefits, until the payments far exceeded what was being paid out. So, we're just speculating here. That's what we do in the law. We try to figure out the answers to problems, sometimes even before they exist. It's true, and I think the question here is what obligations do trustees of an ERISA benefit plan? Now, this particular... Who's holding the money? Is it the South Bay plan, or is it the plan that's set up pursuant to this agreement? It's the South Bay trust that's holding, those trustees are holding the money. It was paid over to them. This plan is created as a new plan. So, you have the original group, the Baker's trust, and then you have the Teamster's trust, and then you have a plan that's created. And the plan has its own set of trustees, which include the Baker's and the Teamster's trustees. So, is it the trustees of that plan who have the duty, or is it the trustees of the Teamster's plan who have the duty? Both, and that's why they themselves listed in the summary plan description that was sent out to the participants, they listed both sets of trustees in the summary plan description. So, they both had obligations. You have nine minutes left. You said you wanted to save ten. Okay, well... You haven't gotten to the question of the exception, which the district court relied on. Well, that is very simple to deal with. I can just deal with that quickly. The critical part of that exception was not whether they're an insurance company, insurer, or whatever you want to call it, it's whether they're qualified to do business in the state. That's what the statute says. It says insurance company, insurer, all these things, qualified to do business in a state. That's where they fell short because of the Deamer Clause in ERISA that says they cannot, as a matter of law, be qualified to do business in a state. And that's what was ignored. Is there a dispute as to whether they are qualified to do business in the state? Yes. Well, it's not a dispute. I would say, as a matter of law, they are not because of the Deamer Clause. Well, what I was asking, do your opponents disagree? Do they contend that they are qualified to do business in the state within the meaning of the provision? They've ignored this argument, so you'll have to ask them that question. All right. If you want to save the time. Yes, I'd like to save the remaining time. Thank you. Good morning, Your Honor. I guess where I come down on this, to some degree, is I agree with Judge Rafiti when he said that the arguments that counsel make for the security fund defy common sense. Not only do they do that, but they disregard the 14-year history of the relationship between these parties and the four agreements that they entered into, none of which require the South Bay Trust to set aside funds specially for their participants or to refund to their participants or to their trusted entity. Well, it doesn't. It's true. It says that this money is paid for a particular purpose. It's paid to fund the death benefits to these particular beneficiaries. That's what the agreement was. Nowhere does it say you can use those monies for some other purpose, nor does it say anywhere what happens upon termination. I agree, Your Honor. But what you have to do is understand the context in which this agreement was. I do understand the context. And the statement made on the letter, when this agreement was delivered to our side by their counsel, he said this, with this letter I'm enclosing a draft of the agreement between the two funds whereby South Bay will provide death benefits to security fund participants. The thrust of the agreement is to indicate that security fund participants will participate in the death benefit plan maintained by South Bay. Counsel, do you have a theory as to what South Bay thought was going to happen with the $5.50 coming in a month? Did they think that this was going to fully fund death benefits and that there wouldn't be any overage? I think they had no idea at the time that that was the case. So there was a possibility there was going to be an upside. There was a possibility there was going to be a downside. Absolutely. And they were willing to assume the risk of paying out additional death benefits above and beyond the monies they were collecting. Yes, that's absolutely true. In fact, that's the obligation that they had in this. I think what the parties were doing was quite obvious. They were treating this as the security fund participants joining into this plan as participants in the death benefit plan that they had. And, therefore, they were part of the large multi-employer group involved in the death benefit. Did South Bay purchase insurance outside? No. This was all self-funded? Right. It was all self-funded. So it's funded from the pool of assets that it has, that it takes from all the employers. And it's clear under the British Motors case and under Demasey and all the other cases that it's not always going to be the case that the contributions made by one employer or on behalf of its employees will be used to pay that employee's benefit. There will be overlap. That's the very nature of multi-employer plans. And our plan for 14 years was treating these people as participants in its plan, like all the other participants in its plan, making all of its investment decisions on the basis of the actuarial analysis that's done that looks at the assets that the plan has and looks at the potential liabilities that it has, looks at the investments it has, and looks at the contributions that come in for it. Counsel, what do we do with the insurer exemption? I don't think the insurance exemption is relevant, to be honest with you. But it's there in the statute. I understand. But I think what you have to look at is, is this an asset of security fund or is it an asset of the South Bay once the funds are received? This is typical of any premium type of payment or contribution. You're not relying on Judge Raffiti's decision that they're an insurance company. I don't think they're an insurance company, Your Honor. I agree with you. Right. I think this is performing an insurance function for sure, and all the parties have agreed that this is equivalent. Your argument then is you're going to disagree with Judge Raffiti. No, I'm not disagreeing with him per se. The problem is there's no— Do you agree that you're covered by the insurance exemption because that's what Judge Raffiti said? I have found no case, Your Honor, that goes into a circumstance similar to ours. I think we're breaking some ground here. We're trying not to break any eggs in the process, but we're certainly breaking some ground. But what do we do? I've heard you say two different things now, and now I'm really confused. I heard you tell Judge Reinhart that you didn't think that the insurance exemption was even applicable. That's where Judge Raffiti was. Even relevant. No, what I meant is I don't think you have to go there to reach the conclusion that Judge Raffiti reached. I don't think his conclusion was quite that narrow. I think you have to look at both the transcript of the summary judgment and the transcript of the motion for attorney's fees to get the full context of what his views were. You basically have a different theory than Judge Raffiti had. Your theory, as I understand it this morning, is that you are a trust fund, and they became part of your trust fund. Right. And that's what the case is about, whether they became part of it or whether it's a separate fund to be administered for them. That's partly true, Your Honor. When they become part of our fund, they're like any of the other participants in this call. Yeah, you're saying they're like another employer joining and making contributions. When they leave, they do not get to take anything that they consider to be the excess that's left over. That's part of it, and that's one basis for this. I think you also have to look at the circumstance, in addition to that, that says, well, what in fact did they do here, and what did they intend to do? Well, that's just another way of getting to the same conclusion, that your position is that they became a part of your fund, and therefore you had a right to do whatever you wanted with those funds, just as if they were another group of employees who were now covered as part of the Teamster Fund. And that's true, but there's an alternative basis. What's the alternative? And that's to look at what in fact happened in terms of what they did. And that's the way you treated it, is your argument. That's absolutely the way it's treated. All right, let me say that's what's happened, and that's the way we treat it. Also, though, you have to look at this. Their discussion of what's an asset of which fund, I think that that's also an alternative basis on which to rule in South Bay's favor,  They want to buy a benefit. They could go to insurance companies and buy that benefit, but they don't. Instead, they choose to purchase that benefit through our multi-employer fund, right? If they would use this money as a premium to buy an insurance benefit, at the end of the insurance contract, there's no way they could claim that that was an asset. The difference left over was an asset of theirs to be returned. Nor could they, while those funds were being used, say that those are assets of our plan. We're entitled to accountings for them. We're entitled to sequestration of those funds. We're entitled to know what you're doing with the investment of those funds or anything like that. They buy a benefit in a fixed amount for a fixed price. That's why this is analogous to that part of the code. It is, and it's analogous, but if it were an insurance company, the law says you don't get your money back. If they're not an insurance company, then you have a trust obligation to – then what's the difference? Then you have to look at it and say, is this an asset of security funds? Still, once they've delivered the premium payments over to South Bay, because what you're looking – you're focused on whether it's an asset, and I say it's not because once they deliver that over to us, what do they get in exchange for that? They're not delivering that money to us as an investment. They're delivering that money to us in exchange for the promise to provide the death benefit for the thousands of employees that they have that are subject. The contract says they're giving it to you for a particular purpose. They're not giving it to you to do whatever you want with as long as you give them a benefit. They're giving you the money for a purpose in order to fund the payment of death benefits. It doesn't say in the agreement that you can use the money for any other purpose? It's the same as saying we're giving it to you as a premium for the death benefit, Your Honor. What they were doing is they were trying to draft an agreement that wasn't an insurance agreement. So they were trying to avoid that kind of language. They said they can, but it's clear that the parties always treated this, in effect, as the equivalent of – they talked, they called it insurance, they called the payments premiums. It's all through the minutes of both funds and everything. It was always treated that way. Is this a common arrangement? Do you know of any arrangement with anybody else? No, this arrangement is not common. Do you know of anybody else who's ever done this? I personally don't, but in taking the deposition of counsel for the plan, he indicated that he was aware of several instances of this type of arrangement, but it was not common. It was basically the expression that he used, or not frequent. Certainly it's not. What would have possessed the South Bacon Society to go into the insurance business? They had – I don't think they were possessed to go into the insurance business. I thought they looked at this as a way of helping a fund, another fund, because they had a multi-employer fund that existed that they provided this benefit. They have a large pool of assets for this. The security fund wants the best of both worlds. They want to effectively say, we should get all that money back, so we should only pay what was paid out in benefits without having any of the risks. What they're saying to you, as I understand your explanation, is you have a big fund and you can get them a lower rate than they can get on their own, so you're going to be nice to them because the Teamsters is such a generous union, and therefore you're going to help them get these death benefits at a lower rate. And then you want to keep two-thirds of the money that was contributed for death benefits, and you want to keep that as profit. It's not profit. Because all you did was enable them to get a lower rate than they could have gotten by themselves. And now, for that, you want to keep two out of three million dollars. The parties negotiated those rates, Your Honor, and all. I understand it was negotiated. And if at any time they were concerned that they weren't paying too much. Judge Biby asked you why you did this. What was that? Judge Biby asked why you did this, and you explained that you were a large fund and it was harder for them to get these rates, and you got them a good rate. We were able to provide them the security of having the death benefit they wanted for all of their participants at a rate that was acceptable to them. That they couldn't have gotten themselves. So you got it. That was very generous and very nice of the team. And in exchange for that, though, Your Honor, we took all the risk of what funding, whether this funding would be adequate, when the deaths would occur. Well, you made a very good decision if you could make this kind of profit out of the contributions for the health and welfare and benefits of the employees. The problem is that this is, you can't look 14, 15, 16 years after the fact and say we don't think we made a good deal and therefore we want to change it. And now we want all the money back that didn't have to be used for these specific participants. Because money was being used for all participants in the multi-employer plan. If you had paid out more in death benefits, what would the South Bay Fund have done if they realized they were paying out more in death benefits than they were taking in? Terminated the agreement? No, you couldn't terminate the agreement during its term because we entered an agreement. We had the obligation during that term. So it would have simply gone to its members and told them that they had made a bad investment? We had a pool of investments, Your Honor, from which to draw from for that. If at the end of the three-year term we determined that it wasn't an effective agreement, that there was too much risk for us, there were being too many deaths, the amounts weren't enough, we would have at that stage either negotiated an increase or terminated at that time. But certainly during the term of the agreement, we had that obligation. It was an unconditional obligation to pay any death benefits. Don't forget, they didn't start this fund off with a large reserve to take care of any of the deaths that might have occurred before the premium payments were sufficient to do that. Was there ever a point in the history of the agreement that you were underwater? Certainly in the beginning you're underwater. You have to look at the actuarial circumstances. Is that true in this case? Was there a point where South Bay had paid out more death benefits? I don't know. I don't believe so, Your Honor. But it's never been looked at in that sense. It's something that the actuaries would have done on an annual basis in terms of the plans because that's what all plans like this have to do. But certainly it apparently wasn't that case because they never increased the premium payment during the four-year or the three subsequent terms. So my assumption is, therefore, the plan was doing sufficient contributions in which to make the benefit payments. If that's so, I don't understand your argument about the risk that the plan you represent took and why it's justified that you keep two-thirds of the contributions at this point for that risk. Well, that's sort of twisting it a little bit. In the beginning, in all stages of insurance plans, there's risk involved, whatever the risk is that you're insuring for. Or in the death benefit case like this, you're insuring for the risk of the death or providing the benefit for the risk of the death. So those are real risks that you have. You don't know when they'll occur, but you have that risk that you have to pay out when they do occur. And the nature of this plan was very simple. They were providing a death benefit to all of these employees, and they weren't given a reserve with which to do that. They had to do it on the basis of $5.50 per month per participant premium, plus the pool of assets that they had in there, which would help cover for death benefits. So it was all part of the whole. It's typical of any multi-employer plan that you have the whole is covered by the contributions from all of the different employers making the contributions, and that's what they were doing. You know, they clearly agreed to provide the $10,000 death benefit in exchange for $5.50 per month. That was the agreement by the parties. They could have changed it at any time if they didn't like it. They never viewed the money they paid to us to be their assets because they never booked it, for example, on their 5,500 as an asset on their plan. They treat it as an expense that they had to pay out like all the other insurance premiums that they paid out or like their brand or legal fees or anything else. They were expenses that they were . . . But isn't the whole purpose of the insurance company exception to the obligation to treat trust fund plans as solely for the benefit of the beneficiaries that you can enter into an agreement with an insurance company and you can make a deal to buy a guaranteed benefit policy from an insurance company? But if it's not an insurance company that's authorized to do business in the state, then you can't make that kind of an arrangement. You can't give away trust funds. The trust funds remain . . . You must still use . . . You have a trust obligation toward those funds to use for the purpose of the beneficiaries. And they did that, Your Honor, and they weren't giving away trust funds. They were buying a benefit from us, a death benefit from us, just like if they bought it from an insurance company or from some other source. They weren't giving away the funds. That was the consideration. If they bought it from an insurance company, that would be very different because that would be covered specifically by a passage in ERISA. But you conceded that South Bay is not an insurance company. I'm still trying to figure out why . . . I think you're arguing that ERISA is irrelevant to all of this. No, what I'm arguing is that it ceased being their asset, South Bay. Those monies that they gave us ceased being their asset when they gave it to us in exchange for our promise to provide the death benefits. That sure sounds like . . . The reason that that seems to make sense is because there's an exception here for insurance companies, but you're not qualified for that. But it's . . . I agree that if we fit into that exception perfectly, that would end it, but I think you don't stop the analysis there because you have to look at what's an asset and what isn't an asset. Let me ask you one question. Are there any factual issues at this point in this case? It appeared to me that you agree on all of the facts, or maybe not. Assuming the exemption doesn't apply, and the question is, do you have a trustee's obligation to use these funds solely for the benefit of the Batebee workers' participants, if that's the question, or can you use them for the benefit of the Teamster participants as well in a mixed group? If that's the question, are there factual issues to be resolved, or is that, at this stage, a question of law of what your rights are under the statute? The only factual issue that I think may exist is the question that you raised in the beginning about there being some sort of separate and independent plan. There was never a separate and independent plan created for their participants that these funds were put into. There wasn't and there couldn't be. Is there anything to be determined about that other than, I mean, is there any evidence anybody wants to introduce, or is this decision going to be made on the agreement? Well, I think it's a question of law or fact. What? It may be a mixed question of fact and law because of the way it's stated, and I don't think you can decide it just on the basis of the agreement. I think you have to look at the entire circumstances. Well, are the entire circumstances in the record? Yes. All right. Thank you. I'd actually like to pick up with that very last question about whether there's a dispute. I think it's our position there is no factual dispute as to liability, that that follows as a matter of law from the record that's already in front of the court. The only facts that need to be developed, we believe, is for the remedy. We're asking for an accounting to determine exactly what happened to this money, what's left, where did it go. And so there is an issue as to the remedy, and I want to emphasize that the remedy isn't necessarily just a refund of the money. I know that's been brought up, but we would be happy if they used that money to pay more benefits for our participants or if they bought insurance to do that. I mean, there's a lot of ways that could be done. The point is that money can only be used, however much there is, which is a matter of fact, whatever is there, is left, can only be used to pay benefits for the bakery driver participants. And that follows both from the agreements and from ERISA. That's their duty. I also wanted to get back to the hypothetical of what would happen if there was not enough money to fund these benefits at any time, which, again, never happened if you prepared a summary. We understand it didn't happen. Okay. Our position is they would not be required to pay out of the funds that are supposed to be earmarked for their participants for our participants. They could have stopped paying the benefits until it was funded. They could have asked us for more money. Again, we're speculating, but our position is they were not required to use anything but the money we gave them to fund these benefits. That was the whole point. This money was given to fund these benefits. So there is no risk, and there shouldn't be, because even though they acted like an insurance company, they're not. They're an ERISA plan, and they have a duty just to do one thing, to provide the benefits for the participants. What's the obligation of an ERISA plan to provide benefits that it promises to provide if the funding falls short due to unwise investments? Well, they have a choice, which is cutting benefits or increasing contributions or, in the worst-case scenario, terminating the plan. I mean, that's a choice that comes up many times. It didn't come up here, but they did have several choices. ERISA benefit funds are not supposed to be at a risk. The whole point of ERISA is to guarantee and to preserve these funds. Could you have, if you had wanted to enter into an agreement to merge the bakery drivers into the Teamster Fund, and could you have provided in an agreement, we would like to have our members covered by your fund as if they were Teamsters, and we will give you our contributions, which you may merge and put into your fund? That could have been done, but that wasn't what was done. And, in fact, ERISA does have special requirements for a merger or a partial termination of a benefit plan like that. But that's a permanent arrangement, and that's not what happened here. If it did, it would be a totally different story, and there would be other provisions of ERISA that would kick in to regulate what happens. What we have here is two funds. Now, a fund is different from a plan. Each of the funds here administers several plans, and so this is just one of these plans that happens to be for the benefit of the bakery driver participants, but the money is being administered by the South Bay trustees, and the administrative services is being provided by a third-party provider. It's clear it's set up as a separate plan, but the money is within the fund in the hands under the control of the South Bay trustees, which is why they have an ERISA fiduciary duty over it. Is it your view that South Bay was never obligated to pay out more than it took in? Yes. I mean, how that would play out, I don't know. We'd have to speculate about what would actually happen, but no. I don't think we could legally require them to pay out in both benefits and administrative fees more than we were putting in. Well, except that you didn't see the funds to start with. They didn't put any reserve in, as Mr. Bannock pointed out. Yes, so hypothetically that could have arose. It didn't. The first week they could have paid out $10,000 in death benefits to somebody who was a member of the bakery drivers and received a couple hundred dollars in fees. That's possible, and it may have been made up right after that, but that's, again, we don't know. But I think the legal point is that we could not require them to do that. Well, if the first day three people died, you could require them to do it because you would say that over a period it would be funded, and that was the agreement, just because in one day it exceeded the amount they had already received wouldn't mean that the agreement wasn't sufficient to allow them to pay those benefits over a reasonable period. Well, again, it's a question, well, first of all, do you judge it day by day, month by month, year by year? I don't know. I mean, it's all speculation over the entire period of each agreement. The only thing that's clear is that, in the end, we could not require them to pay out more than was going in. And, again, how that would be resolved is a matter of speculation because it never— You see, they take a different view on that, as I understood counsel. They believe that their obligation was to pay death benefits for those bakery drivers that deserved them, even if the reserves or the contributions weren't sufficient, which implies to me that a component of the $5.50 per month involved the risk that they might have to do that. In other words, it wasn't just to fund those benefits, but there was a risk component as well. Well, that indicates they're acting like an insurance company. Well, suppose they did. I mean, suppose they did take a risk and they could have lost money. Does that change anything? If they acted like an insurance company and they wanted to be nice, maybe they hoped someday to get the bakery drivers as members, and maybe they wanted to take a risk by proving to them what a good plan they were and what good fellows they were. If that was the case, they would not be acting like an ERISA plan like they're supposed to. They'd be acting like an insurance company, and they may be subject to taxes for that. If they made a profit or claim a loss, if they lost money. So you're saying that if they wanted to pay debt benefits when your payments fell short, they couldn't do it? If they wanted to act like an insurance company. No, don't tell me about insurance companies. The question is, if they fell short and they didn't have enough money to pay and they still wanted to pay, that if they paid debt benefits to your members who expected them and who died, that you would not approve of that, that would be either illegal or improper? No, I think in that scenario, they could have paid the benefits and then come back to us to make up a difference if it turned out it was falling short. Again, we're speculating here. Again, we do sometimes engage in asking hypothetical questions so that we see how a theory works out. Not just in a particular case, but in general. If we establish a rule of law, how is it going to work? That's why we ask hypothetical questions and we speculate, as you have commented at least 20 times. My speculation would be that under pretty much the same theory that we've been espousing as to our fund, they could say, we're not required to use the money that we're obligated to reserve for our participants to pay for your participants. One way or another, whether it's you put in more money or we stop paying benefits, we have to change this. They would not have the legal obligation at that point because they are an ERISA plan, not an insurance company. That's why insurance companies are separately regulated. If this was just buying insurance like they said, that's admitting it comes within that exception. The only reason that these would not become assets in the hands of an insurance company is because of this exception. And that's why, because they're not an insurance company. They can't qualify. It is an asset. They do have an obligation. ERISA covers this. All right. Thank you, counsel. Thank you. The case just argued will be submitted. The court will stand in recess for the day. I have no speculation. All rise. This court for this session stands adjourned.
judges: Reinhardt, Bybee, Burns